13 CV 1504

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X

GARY DEDILECTIS,

                        Plaintiff,      :     No.

   -against-

DEUTSCHE BANK SECURITIES, INC.,    :   **COMPLAINT**
DEUTSCHE BANK AKTIENGESELLSCHAFT,

                    Defendants.

-------------------------------------------------------- X

      Gary DeDilectis ("Plaintiff" or "Mr. DeDilectis") by and through his attorneys,

Thompson Wigdor LLP, as and for his Complaint against Deutsche Bank Securities, Inc. ("DB

SI"), Deutsche Bank Aktiengesellschaft ("DB AG") (collectively, "DB," the "Bank" or

"Defendants") hereby alleges as follows:

## NATURE OF ACTION

    1.    On January 11, 2012, Defendants terminated Mr. DeDilectis from his position as a

Director of Operations at DB because of and in retaliation for his complaints and concerns about

DB's operational systems issues, uncorrected overcharges and false charges to clients, as well as

regulatory misconduct amounting to fraud and other unlawful conduct in violation of federal

securities laws including, but not limited to, the Securities Exchange Act of 1934, rules and

regulations of the Securities and Exchange Commission (SEC), federal laws regarding fraud

against shareholders, the Dodd-Frank Wall Street Reform and Consumer Protection Act and

Financial Industry Regulatory Authority (FINRA) rules.

2.     Mr. DeDilectis began to discover the various severe systems outages, overcharges and potentially fraudulent conduct by DB in or around August 2010, and each time Mr. DeDilectis escalated the issues to his superiors, in some cases raising the same issues multiple times when it became clear they had not been addressed by DB or its management.  DB's senior management, however, ignored Mr. DeDilectis's concerns.  On numerous occasions, senior management let it be known that officials were "not happy with [Mr. DeDilectis]" for "documenting all these issues in his PowerPoint presentations."  Defendants summarily terminated Mr. DeDilectis's employment on or about January 11, 2012, providing no notice or any performance-related explanation.  Management's express disapproval of Mr. DeDilectis raising these issues, in addition to other circumstances and actions by Defendants, demonstrate the retaliatory nature of the termination and pretextual nature of any purportedly legitimate reason proffered by DB.

3.     These actions by DB and its management are both symptomatic of and supported by an organizational culture of disregard for legal compliance and the effects of the Bank's actions on its employees and the public.  In recent years, DB's most senior officials have consistently affirmed this culture through their pursuit of ever more aggressive and reckless business practices, and their failure to put a stop to the continuing string of financial scandals and legal violations that have been found or investigated at the Bank.

4.     Several major scandals have emerged in the past year illustrating the widespread nature of this attitude at DB.  The emergence of these scandals and the rise of the unlawful and reckless conduct behind them coincided with the Bank's attempts to silence and eventual retaliation against Mr. DeDilectis because of his insistence upon calling attention to and seeking assistance with major compliance problems and potential legal exposure at the Bank.

5.     By way of example only, in December 2012, DB's co-CEO Jeurgen Fitschen as well as its CFO Stefan Krause and two other board members became the subject of an investigation into severe tax evasion allegations involving the trading of carbon emissions certificates.  Five Bank employees were arrested in connection with the allegations (Mr. Fitschen and Mr. Krause were not among them).  Mr. Fitschen was reported to have called a German regional governor to complain about the police raids.

6.     The raid of December 2012 followed the arrest of several other DB employees accused of similar VAT tax fraud regarding carbon emissions trading in a 2010 German police raid.  Before the 2010 raid, investigators recorded a supervisor telling a Bank employee over the phone to prepare for the raid, which was to happen the next day, but to act surprised when members of the prosecutor's office showed up at his office.

7.     Indeed, also in December 2012 it was found by a German court that DB played a key role in causing the bankruptcy of the media empire of the now-late Leo Kirch.  DB was found in 2009 to have been spying on Mr. Kirch and other members of DB's supervisory Board, as well as a shareholder, attorney Michael Bohndork, who had questioned the Bank closely at shareholder meetings and threatened legal action if their questions about Bank dealings were not answered.  These incidents illustrate the lengths to which DB has gone to silence and retaliate against critics and whistleblowers, even those who are prominent senior officials.

8.     In or around May 2012, DB's mortgage unit is reported to have paid a fine of $202 million and admitted guilt in order to settle U.S. Department of Justice charges of filing false compliance statements with the Department of Housing and Urban Development ("HUD").  At the time, U.S. Attorney Preet Bharara stated that the requirements violated by DB "are not mere technicalities to be circumvented through subterfuge as these defendants did repeatedly over the

course of a decade. Their failure to meet these requirements caused substantial losses to the Government – losses that could have and should have been avoided." Unfortunately, DB's management had no more regard for the operational deficiencies and unfulfilled legal requirements highlighted by Mr. DeDilectis during his last year of employment than it did for the accuracy of the documents filed with the Department of Housing and Urban Development by its mortgage unit.

9.     DB also is widely reported and identified as one of the primary banks involved in a global scheme to manipulate the London Interbank Offered Rate (LIBOR).

10.    Moreover, DB has retaliated against other employees who have complained about various forms of discrimination. In connection with this retaliation, DB has conducted both internal and external investigations in an attempt to justify its unlawful behavior.

11.    Mr. DeDilectis accordingly brings this action to recover damages arising from the Defendants' unlawful termination of his employment in retaliation for his protected whistleblower activities in violation of Section 806 of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A (the "Sarbanes-Oxley Act").

## JURISDICTION, VENUE AND PROCEDURAL PREREQUISITES

12.    Jurisdiction is conferred on this Court by 18 U.S.C § 1514A and 28 U.S.C. § 1331.

13.    Venue is appropriate in this District under 28 U.S.C. § 1391(a) as the Defendants' regional headquarters offices are located at 60 Wall Street, New York, NY 10005.

14.    On April 6, 2012 Plaintiff timely filed a Complaint with the Occupational Safety and Health Administration ("OSHA") of the U.S. Department of Labor, alleging violations of the "whistleblower" provisions of the Sarbanes-Oxley Act (hereinafter, the "Administrative Complaint").

15.     By letter dated November 8, 2012, OSHA issued its letter providing Plaintiff with an administrative dismissal and withdrawal of the Administrative Complaint.

16.     OSHA did not issue a final decision on Plaintiff's Administrative Complaint within 180 days of the Administrative Complaint's filing.  Accordingly, pursuant to 18 U.S.C. § 1514A, Plaintiff is entitled to seek *de novo* review of her Complaint from this Court.

17.     On or around November 8, 2012, Plaintiff in writing informed OSHA, the U.S. Department of Labor and the Office of the Chief Administrative Law Judge of the U.S. Department of Labor that Plaintiff intended to seek *de novo* review in federal court rather than continue to seek relief through OSHA's procedural mechanisms.

## PARTIES

18.     Mr. DeDilectis worked as a Director of Equity Operations and Asset Servicing for DB from the beginning of his employment on or around December 4, 2007 until his termination on or around January 11, 2012.   He is a citizen of the United States and at all relevant times met the definition of Deutsche Bank "employee" and/or "eligible employee" under all applicable statutes.

19.     Deutsche Bank Securities, Inc. is a Delaware limited liability company with a principal place of business in the United States at 60 Wall Street, New York, New York 10005. Defendant Deutsche Bank Aktiengesellschaft conducts business and maintains operations and facilities in New York City, and its shares are listed on the New York Stock Exchange.  At all relevant times, Defendant Deutsche Bank met the definition of "employer" and/or a "covered employer" under all relevant statutes, and currently maintains approximately 11,000 employees in more than 28 states and 90 cities throughout the United States.  DB is one of the world's largest banking and financial services firms.  As a publicly held corporation which is listed on

the New York Stock Exchange, DB issues multiple classes of securities required to be registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. § 78) and is required to file reports under Section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. § 78o(d)).

## PLAINTIFF'S EMPLOYMENT WITH DEUTSCHE BANK

20.     Mr. DeDilectis began his employment for DB in New York as a Director of Equity Operations and Asset Servicing on or around December 4, 2007.  In that role, he was responsible for managing day-to-day operations for Deutsche Bank Securities, Inc.

21.     In 2008, DB moved some of its securities operations from New York to Florida. At the request of DB, Mr. DeDilectis commuted weekly from New York to Jacksonville, Florida from around May 2008 until August 2010.

22.     In or around August 2010, Mr. DeDilectis loyally relocated his family to Jacksonville at DB SI's request, at great expense and inconvenience to himself and his family. Mr. DeDilectis was led to believe that, as a result of the move, he would be tasked with bringing the Jacksonville office's operations in line with those of the rest of DB's U.S. facilities and would have a place with Defendants there for many years to come.

23.     Mr. DeDilectis excelled in his role and, toward what turned out to be the end of his employment with DB, became increasingly vocal about DB's operational and systems issues and regulatory misconduct in an effort to protect the Bank against significant legal and monetary risk and exposure.  As a Series 24-registered supervisor, Mr. DeDilectis, along with other DB officials and managers, could be held personally responsible for and suffer criminal and professional sanctions in connection with certain regulatory and legal violations.

24.     Michael Fleming was, at all relevant times, a Managing Director at DB and Mr. DeDilectis's immediate supervisor. Prior to Mr. Fleming's employment at DB, he had no prior financial services or securities operations professional experience.

25.     At all relevant times, Mr. Fleming had supervisory authority over Mr. DeDilectis and had the power to investigate, discover, or terminate misconduct as alleged herein, and is otherwise covered by the provisions of 18 U.S.C. § 1514A, as is DB.

26.     Indeed, in or around November 2011, less than two months before Mr. DeDilectis was eventually terminated, Mr. Fleming personally thanked Mr. DeDilectis in writing for providing input that contributed to an "excellent 2011 overview and 2012 plan."

27.     As set forth in more detail below, during his employment, Mr. DeDilectis provided information to Mr. Fleming and other members of senior management that serious violations of fraud, money laundering, mail fraud, bank fraud, and/or federal securities laws were occurring at DB on an ongoing basis.

28.     On or around January 11, 2012, Mr. DeDilectis was terminated summarily from DB, without warning or any explanation.  No performance-related criticism was given to Mr. DeDilectis at the time of his termination as his performance for the Bank was outstanding.

## DEUTSCHE BANK'S VIOLATIONS AND PLAINTIFF'S PROTECTED ACTIVITY

29.     During his employment with DB, Mr. DeDilectis raised concerns regarding a number of DB's systems and operational issues to several senior executives at DB.  Mr. DeDilectis believed that these issues placed the Bank, as well as various officials and managers, in a position not only of legal and regulatory noncompliance, but in a position of potential civil and criminal legal liability under SEC and other federal rules, regulations and statutes.  Mr. DeDilectis also believed that these issues potentially constituted several types of fraud, including

securities, wire, mail and other varieties of fraud, as clients had unknowingly been subjected to improper fees and overcharges.

30.     Mr. DeDilectis repeatedly informed his managers and DB officials about the legal and regulatory nature of the issues he raised.  In presentations and on calls, he expressly mentioned the regulatory and legal risks being run by the Bank, the exposure to which the Bank was subject as a result, as well as the "displeasure with our control environment" expressed by both FINRA and federal authorities.  Mr. DeDilectis outlined plans of action to address these issues, but was denied any additional resources or follow-up action by the Bank.

31.     Upon information and belief, SEC investigations into DB's conduct in connection with stamp tax overcharges to clients, as well as client substitute payment issues and possession and control problems, continue to date.

**Severe DB Systems Outages**

32.     Beginning in or about August 2010, severe systems outages occurred due to a lack of investment by DB in this area.  This gap between DB's desire to offer certain securities and financial services and its electronic capabilities resulted in hundreds of severity 1 outages (a critical, complete systems outage) and thousands of severity 2 and 3 outages (an urgent or partial outage and important quality of service issue, respectively) over the course of several weeks.

33.     During this period, Mr. DeDilectis was aware of approximately eleven to fifteen separate instances during which customers' fully paid securities were not being segregated from the Bank's own proprietary positions, violating possession and control regulatory requirements. This is but one example of the serious and critical systems issues that caused DB to violate its most basic obligations to its clients as a regulated provider of financial services and trader of securities.  Possession and control issues were rampant at the Bank due to its failure and/or

inability to maintain control of its books and records by failing to run account reconciliations on a regular basis to ensure that all transactions were properly reflected on the Bank's books. By way of example only, a failure to reconcile accounts would lead to the commingling and misidentification of customer funds versus the Bank's own proprietary accounts. Such lax possession and control issues pose a particularly serious risk of exposure to exponential financial losses due to margin trading and leveraged transactions. For these reasons, failure to adequately reconcile accounts is a violation of both FINRA and SEC requirements. Upon information and belief, these possession and control issues continue up to the present day without adequate action taken by DB to remedy the systems deficiencies that cause them.

34.   As a further example of such segregation and possession and control issues, DB's proprietary system was not equipped with the proper algorithm to handle dual-eligible securities properly, therefore failing to segregate and assign customer securities if a transaction involved securities that could be held in more than one country (i.e., settlement locations). This failure to properly segregate customer securities would lead to inaccurate and noncompliant reserve calculations, among other regulatory and legal violations.

35.   Moreover, tens of thousands to hundreds of thousands of purchase and sale ("P&S") breaks (mismatches of various aspects of securities trades) were occurring daily, far above the industry norm at comparable firms of around 100 to 1,000 P&S breaks each day. As a result, DB often failed to report breaks to the trading desks for several days at a time, which meant that the Bank did not know which trades matched up with their counterparties and which did not (with respect to number of shares, prices, settlement dates, commissions, SEC fees, etc.) for far longer than was acceptable under books and records requirements.

36.     Other severe books and records violations occurred due to the systems deficiencies pointed out by Mr. DeDilectis.  By way of example only, customer securities were not delivered to or received by purchasers at all on several occasions, and routinely were not delivered in a timely fashion, causing unacceptable numbers of failed customer trades which were not carried out for days after a customer's initial order.  These were not isolated instances, but were common and systemic issues that called into question DB's ability to deliver basic trading services as a broker-dealer at a legally permissible level of reliability and accountability.

37.     Mr. DeDilectis believed these systems outage problems constituted violations of the Securities Exchange Act of 1934 and FINRA Rule 4511. Mr. DeDilectis considered making an independent report to enforcement authorities, but instead sought to work towards the resolution of the various issues he encountered at the Bank by escalating his concerns to appropriate senior officials, some of whom are specifically responsible for reporting violations and other matters to FINRA and U.S. enforcement representatives.

38.     Mr. DeDilectis repeatedly escalated these issues to Senior Management between August 2010 and January 2012, reporting them to various DB officials including Mark Bradbury, Peter Marchewka, Michael Fleming, Lynn Hall, John Lafond, Anthony Stucchio, Scott Simon, Arindam Banerji, Martin Slumbers and Tony McCarthy.

39.     Mr. Fleming reacted uncomprehendingly to Mr. DeDilectis's concerns, and expressed his unwillingness to be informed regarding the severity of these failures by DB's systems and the Bank's obligations to supervise and properly carry out transactions and remedy books and records violations.  Mr. Stucchio, the Chief Regulatory Officer, remarked on at least one occasion that he believed the issues raised by Mr. DeDilectis would need to be brought to the attention of FINRA.

40.     Moreover, in or around October 2011, Mr. DeDilectis met with Mr. McCarthy and others for around an hour about these issues and their impact on the Bank and its customers. Mr. DeDilectis made it clear that these issues had to be fixed immediately, but no action was taken by the Bank to correct the outages.  Mr. DeDilectis, as an operational manager, did not have the information technology expertise or resources to solve these issues on his own, and his requests for follow-up by the Bank were denied or ignored.

41.     Mr. DeDilectis also issued various reports regarding these systems issues in both 2010 and 2011, erasing any doubt regarding his determination to make these issues known to the Bank's management and obtain the resources and authority to remedy them.

**Stamp Tax Overcharges**

42.     Mr. DeDilectis reported to the Bank that a weekend systems enhancement conducted before Thanksgiving 2011 had caused around one million dollars of overcharges to various Bank customers in UK stamp tax, which applies to transfers of shares and securities.  Mr. DeDilectis learned about this event from one of his direct reports during Thanksgiving and worked over the holiday weekend so he could explain what had occurred and propose solutions to senior management as soon as possible.  Mr. DeDilectis made it very clear in his conversations that should these erroneous charges not be corrected, it would be fraud against the Bank's clients.

43.     Mr. DeDilectis reasonably believed that these overcharges, particularly to the extent they were not promptly addressed following their discovery by the Bank, were violations of the Securities Exchange Act, Title IX of the Dodd-Frank Wall Street Reform and Consumer Protection Act and FINRA Rules.

44.    Mr. DeDilectis escalated the stamp tax overcharges issue to Mr. Marchewka and Kim Perlee several times, including via communications by Vincent Wilson, one of Mr. DeDilectis's direct reports, in order to alert the New York sales force to the issue and therefore enable them to inform the client of the overcharges.

45.    However, true to form, management ignored his complaints and, upon information and belief, to date, the impacted DB clients were not notified that they were overcharged approximately one million dollars in UK stamp tax fees.

46.    In addition, Mr. DeDilectis was aware of previous UK stamp tax overcharges that were added to DB's Profit and Loss ("P&L") Statements, rather than refunded to customers.  Mr. DeDilectis's reports of these overcharges to Mark Bradbury, Mr. Marchewka, Kim Perlee and Mr. Fleming in or around November 2011 did not result in any action by the Bank.

**Customer Transaction Confirmations**

47.    In or around November 2010, Mr. DeDilectis also informed senior management, including Mr. Bradbury, Mr. Marchewka, Mr. Fleming, Mr. Simon and Mr. Stucchio, of systems outages that consistently caused large numbers of hard copy customer trade and transaction confirmation notices to be sent to the wrong address or wrong client.  Indeed, Mr. DeDilectis provided detailed information to management regarding the scope and implications of the customer confirmations issue.  In or around May and August 2011, Mr. DeDilectis told management about two separate incidents in which hundreds of electronic trade and transaction confirmations did not go out to four clients due to systems outages.  These incidents led to the clients suspending business with DB as a result of the delayed and misdirected confirmations.

48.    Mr. DeDilectis believed that the Bank was legally obligated under the Securities and Exchange Act to provide such confirmations to clients who do not subscribe to certain

identity confirmation programs.  His escalation of the issue to senior management was intended to alert them to systemic issues that had to be addressed in order to ensure that DB met its legal obligations as a financial services provider.  Furthermore, the Bank was obligated to log such customer complaints with regulators, and should have done so through the office of its Chief Regulatory Officer.  Upon information and belief, this step was not taken by the Bank.

49.    Moreover, when similar customer confirmations issues occurred involving different clients due to a systems outage lasting three days in or around August 2011, Mr. DeDilectis informed the same members of senior management.  He again explained the issues, their legal implications and how DB's failure to maintain systems commensurate with the types and volume of transactions it was handling were placing the Bank in a position where it could not meet applicable legal and industry standards.  DB's chronic delivery of customer trade and transaction information to incorrect clients and addresses revealed vast amounts of client transactional and financial information, and therefore constituted serious and widespread breaches of client confidentiality which occurred over several years.

### Stock Loan Accounts and Other Accounting Discrepancies

50.    In or around January 2011, DB moved its India operations from Mumbai to Bangalore in order to cut costs.  However, the Bank's reckless approach to this transfer of operations exacerbated the Bank's already flawed account reconciliation and balancing processes.  By way of example, during the move, an account used for DB's internal transactions and transfers went unreconciled for approximately three months, creating 1600 accounting discrepancy "breaks," which covered all of the international stocks borrowed and lent by DB for its United States-based clients during that period.  Individual clients were affected for amounts that topped $50,000 or even $100,000 in connection with specific transactions and breaks,

including misapplication of dividend payments.  DB's India-based operations also failed to properly reconcile margin-related U.S. Treasury securities pledges, creating hundreds of additional account discrepancies and client/Bank securities segregation issues.

51.     These major failures by the Bank are merely examples in a pattern of major and chronic accounting breaks.  DB also sent erroneous bills to clients on approximately hundreds of occasions because an account used by DB for transfers and transactions between the United States and United Kingdom went unreconciled for months at a time.

52.     Most shockingly, one day Mr. DeDilectis discovered that a major 24-hour systems outage resulted in a $6 billion discrepancy between the previous day's account balances and undetermined transactions over the previous day.

53.     This was typical of DB's approach to accounting matters, as during Mr. DeDilectis's employment the Bank resorted to manual reconciliation of the stock loan component of its cash reconciliation.  However, this manual process led to at least two instances of major exceptions (one of which was around $538,000) going unidentified for a period of no less than three months.

54.     These accounting discrepancies, and particularly the stock loan accounts issue, were raised consistently by one of Mr. DeDilectis's direct reports, and escalated by Mr. DeDilectis himself to senior management from around June 2011 until his unlawful and retaliatory termination in January 2012.  Among the members of senior management to receive reports of these discrepancies were Mr. Bradbury, Mr. Marchewka, Mr. Fleming, Mr. Simon, Mr. Banerji, Mr. Stucchio, Raj Mehra, Mark Headings (Director of DB AG), Jonathon Foord (DB Operations International), Bobby Handa (Managing Director DB AG) and Jonathon Perret (Director DB AG).

55.   These endemic accounting issues, which directly implicate SEC and FINRA rules and standards, were dismissed and ignored despite Mr. DeDilectis's consistent urging that the Bank take action to address them and improve its systems.  As of Mr. DeDilectis's termination, the issues concerning reconciliation of DB's stock loan accounts still had not been addressed.

### Prime Brokerage Accounts and Global Equity Derivatives Trading Position Reconciliation

56.   Similarly, between October 2011 and his retaliatory termination a few months later in January 2012, Mr. DeDilectis escalated well-founded issues regarding misapplied payments and cash balance discrepancies in unreconciled accounts managed by DB's India-based operations.  Mr. DeDilectis's U.S.-based team regularly examined accounts outside their jurisdiction when asked by India-based personnel to assist in reconciling accounts with unexplained account discrepancies.  Two individual cash discrepancies identified by his team in such accounts totaled $800,000 on their own, and were reported by Mr. DeDilectis to management.

57.   These $800,000 cash exceptions went unnoticed by DB's other personnel for over six months and were found in an unreconciled off-shore margin account.  When it was finally discovered, it took DB personnel over two months to determine where the money had gone and how the failed transaction had gone unnoticed for so long.  Although Mr. DeDilectis and his staff worked feverishly to clean up these discrepancies, DB's senior management disregarded Mr. DeDilectis's warnings regarding the systemic and management-based causes of these issues.  Therefore, because the Bank refused to alter the services it offered to match its capabilities and meet regulatory requirements, it was inevitable that an impermissibly high number of unreconciled accounts would stay undetected and cause losses to clients and the Bank.

58.     Mr. DeDilectis and his direct reports repeatedly and vociferously called to the attention of senior management hundreds, if not thousands, of accounting discrepancies, some for hundreds of thousands of dollars, as well as hundreds of longstanding accounting breaks (totaling over $232 million), as well as the Bank's India-based personnel generally lacking knowledge of U.S. regulatory requirements or experience with reconciliation methods and process. Mr. DeDilectis believed that this pattern of gross deficiencies in accounting and control systems exposed DB to serious legal sanctions and liability under laws such as the Securities and Exchange Act, as well as to common law-based lawsuits for various species of fraud by clients. As with his other operations, compliance and liability concerns, however, Mr. Bradbury, Mr. Marchewka, Mr. Stucchio, Mr. Fleming, Mr. Handa, Mr. Perret and Mr. Simon either ignored or reacted dismissively when Mr. DeDilectis brought these issues to their attention and recommended that the Bank take corrective action.

**Asset Servicing**

59.     In or around November or December 2011, Mr. DeDilectis discovered that one of DB's "platinum" clients was given preferential tax treatment on multiple substitute dividend payments despite the fact that the applicable securities were out on loan for that client at the time, and therefore the client should have been subject to a significantly higher tax rate. Instead, the preferential tax treatment should have been applied to other clients, who held the applicable securities at the time, but were improperly subjected to an unfavorable and higher tax rate. Upon information and belief, these improper assignments of tax treatments were never corrected by the Bank, despite Mr. DeDilectis having escalated these issues to senior management. One of Mr. DeDilectis's direct reports told him that the improper tax rate assignment was done in order to retain a top client, and that a "note" had been placed in a "file" to explain the situation.

60.     As a result, the non-"platinum" clients received an unwarranted higher tax treatment.  The tax rates on the impacted payments for these clients rose from approximately 15 percent to around 25 percent as a result.

61.     Mr. DeDilectis believed this action by the Bank was a violation of various sections of the Internal Revenue Code, and reported the conduct to John Byrne in or around November 2011.

**Mr. DeDilectis Is Cautioned Against Escalating Operational and Compliance Issues**

62.     In sum, the aforementioned activities constitute either direct or circumstantial evidence that strongly supported Mr. DeDilectis's conclusion that DB may have been engaged in and/or could be found liable for fraud and/or federal securities laws violations.

63.     The results of Mr. DeDilectis's investigations of these operational issues caused him to form an actual, good faith belief that DB's conduct constituted or could directly or indirectly expose it to liability for fraud, money laundering, bank fraud, mail fraud, and/or federal securities laws violations.  The array of suspicious and grossly lax conduct by DB described above also would have caused a reasonable person in Mr. DeDilectis's position to form a belief that DB's conduct constituted similar violations of the law and/or illegal or unlawful activity.

64.     Mr. DeDilectis communicated his complaints regarding the illegal and/or suspicious activities described above over an extended period of time to senior executives at DB, including Scott Simon, Managing Director of DB SI, Anthony Stucchio, Managing Director of DB SI, Michael Fleming, Managing Director DBSNJ, Mark Bradbury, Managing Director DB AG, Arindam Banerji, Managing Director DB AG and Martin Slumbers, Managing Director DB AG.

65.     Mr. DeDilectis also communicated his complaints regarding the illegal and/or suspicious activities described above to Mr. Simon, Mr. Stucchio, Mr. Fleming, Mr. Bradbury, Mr. Banerji and Mr. Slumbers via e-mail, telephone calls, telephone conferences, and in-person meetings.

66.     Despite Mr. DeDilectis's conscientiously reporting these illegal and/or suspicious activities in an effort to protect DB, its officers and its clients, his complaints were continually ignored or met with derision or hostility.  By way of example only, Mr. Marchewka told Mr. DeDilectis that senior management was displeased that he was "documenting all these issues in [Mr. DeDilectis's] PowerPoint presentations."  Mr. Marchewka also told Mr. DeDilectis that Mr. Foord had advocated the firing of Mr. DeDilectis because he had raised issues concerning DB's control and supervision of its staff in India, as well as other issues regarding inadequate subject matter expertise, securities issues (including regarding the reconciliation process) and lack of personnel continuity.

67.     By way of example only, when Mr. DeDilectis raised a serious compliance issue and assigned it a "red" status (which meant it could cause loss to the Bank), Scott Simon admonished Mr. DeDilectis and one of his direct reports, and forced them to change the issue status to "amber" (problematic, but would not cause a loss) from "red."  Mr. DeDilectis also was warned not to assign a "red" status to other serious compliance issues which posed a significant risk of losses to clients or the Bank.

68.     By way of further example only, Mr. DeDilectis was told that a member of senior management "wants [Mr. DeDilectis] dead" because of his consistent escalation of securities issues and that a member of management was "out to get [him.]"  On another occasion, Mr.

DeDilectis was told by John Lafond in the presence of his manager, Mr. Fleming, that Mr.

DeDilectis's "stock [was] dropping" because of his various complaints and reports.

69.     On January 10, 2012, Mr. Marchewka met in Jacksonville with Mr. DeDilectis and

Noel Hernandez (a direct report of Mr. DeDilectis), and admonished them both for reporting the

issues regarding the lack of reconciliation of the stock loan accounts.

70.     Mr. Marchewka told them that "DB knows India's support of the US Broker Dealer

operations is not doing the job, but you're either on the team or you're not." Mr. Marchewka

continued, stating that "this is what senior management wants regardless of whether they can

keep control of the books and records." Mr. Marchewka also said that Jonathan Foord, Mark

Headings and Raj Mehra wanted both Mr. DeDilectis and Mr. Hernandez fired for repeatedly

bringing up the stock loan accounts and other operational issues regarding India and the UK.

71.     The next day, Defendants unlawfully terminated Mr. DeDilectis's employment

without any explanation.

### DEFENDANTS' UNLAWFUL TERMINATION OF MR. DEDILECTIS

72.     At around 8:00am on January 11, 2012, Mr. DeDilectis was called into a meeting

by Mr. Fleming and Mr. James Taylor, Vice President of Human Resources for DB SI.    During

the very brief meeting, Mr. Fleming told Mr. DeDilectis that Defendants were terminating his

employment.

73.     Mr. Fleming and Mr. Taylor refused to provide a reason for firing Mr. DeDilectis,

although he asked multiple times for some explanation for his summary termination.

74.     Mr. DeDilectis's termination was carried out without warning or prior notice and

had no performance-based justification, and came on the heels of Mr. DeDilectis raising a host of

urgent issues regarding DB's noncompliance with various U.S. legal and industry standards and requirements.

75.     A few days after his termination, Mr. DeDilectis received an email from Mark Axelrod, the head of regulatory reporting for DB SI.  Mr. Axelrod wrote that he was "shocked" by the termination, and that Mr. DeDilectis was very unusual among DB managers in pointing out what was going wrong at the Bank.

76.     Furthermore, upon information and belief, DB promptly replaced Mr. DeDilectis in his position with a much less experienced employee.  This individual not only had less seniority at DB than Mr. DeDilectis, but his relative lack of experience in compliance work and the financial industry generally make him less likely to identify operational or compliance problems, or to strongly press such issues in the event they are disregarded by management.

77.     The foregoing complaints and reports illustrate how Mr. DeDilectis repeatedly engaged in lawful activity protected under § 806 of the Sarbanes-Oxley Act.  Defendants were aware of such activity and unlawfully retaliated against Mr. DeDilectis by terminating his employment.

78.     These actions were taken in unlawful retaliation for Mr. DeDilectis's efforts to report and prevent what Mr. DeDilectis reasonably believed constituted fraud, as well as violations of the applicable money laundering, mail fraud, bank fraud and federal securities laws, including, without limitation, the Securities and Exchange Act of 1934, FINRA Rules, Title IX of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

79.     The retaliatory termination of Mr. DeDilectis is not supported by a legitimate, business-related explanation that cannot be revealed as a pretext.

80.     Defendants' unlawful retaliation and otherwise unlawful conduct has caused Mr. DeDilectis to suffer severe emotional distress and mental anguish, as well as substantial economic damages and harm to his professional reputation and career progression.

**AS AND FOR A FIRST CAUSE OF ACTION**
**(Sarbanes-Oxley Act Violation)**

81.     Plaintiff repeats and realleges each of the allegations contained in each of the preceding paragraphs as though fully set forth herein.

82.     As set forth above, Defendants violated the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A, by taking adverse employment actions against Mr. DeDilectis, including, but not limited to, termination, in retaliation for Mr. DeDilectis's lawful and protected conduct in providing information, causing information to be provided regarding, or otherwise assisting in investigations of DB's systems and operational issues which had placed and/or seriously risked placing DB in violation of various federal securities laws, and is legal obligations to its clients.

83.     As a direct and proximate cause of Defendants' retaliatory conduct, Plaintiff has suffered and will continue to suffer severe financial, mental and emotional hardship and injury including the loss of compensation, reduced possibilities for equivalent future compensation, and other additional damages, including interest, attorneys' fees, costs and disbursements.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that an award be issued in his favor containing the following relief:

A.     Reinstatement;

B.     Back pay, raises, bonuses, deferred compensation, benefits, reinstatement of seniority and tenure, and other orders necessary to make Plaintiff whole;

C.      An order requiring Defendants to abate and refrain from any further violations of the whistleblower provisions of the Sarbanes-Oxley Act;

D.      An order expunging Plaintiff's termination and ordering Defendants to remove any records of termination against Plaintiff;

E.      An order prohibiting Defendants from disclosing any disparaging information about Plaintiff to prospective employees, or otherwise interfering with any applications he might make in the future;

F.      Compensatory monetary damages in an amount determined to be fair and equitable compensation for Plaintiff's emotional distress and loss of reputation;

G.      Pre-judgment interest on all amounts due;

H.      An award of costs and expenses, as well as reasonable attorneys' fees, incurred by Plaintiff in this action to the fullest extent permitted by law; and

I.      Such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated:  New York, New York
        March 6, 2013

Respectfully submitted,

THOMPSON WIGDOR LLP

By: _____
        Douglas H. Wigdor
        Lawrence M. Pearson

85 Fifth Avenue
New York, NY  10003
Telephone: (212) 257-6800
Facsimile:  (212) 257-6845

*COUNSEL FOR PLAINTIFF*